IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * * * | 4:08-CR-00096 |
| Plaintiff, | * * | |
| v. | * * | |
| WILLIAM EARL CLARK, JR. | * * | ORDER GRANTING COMPASSIONATE RELEASE |
| Defendant. | * * | |

Before the Court is Defendant William Earl Clark, Jr.'s Motion for Compassionate Release, filed by the Federal Public Defender (FPD) on May 22, 2020. ECF No. 95. The Government filed its Resistance on June 3. ECF No. 96. The matter is fully submitted.

I.  BACKGROUND

On April 2, 2010, this Court sentenced Defendant to 240 months imprisonment for distributing crack cocaine with a prior conviction, then the mandatory minimum. ECF No. 91 at 1; ECF No. 61 ¶ 120. Defendant was thirty-six-years-old and already had been in federal custody for nearly two years.[1]

The lengthy sentence capped an adult life littered with bad choices and circumstances. Defendant had drug and firearm convictions going back to age sixteen. ECF No. 61 ¶¶ 70–77. His father spent much of Defendant's childhood incarcerated. *Id.* ¶ 91. His younger brother was convicted of attempted murder in 2000. *Id.* ¶ 90. Defendant joined a gang. *Id.* ¶¶ 13, 18. In too many cases, that would be the end of the matter.

Congress then passed the First Step Act of 2018. *See* Pub. L. No. 115-391, 132 Stat. 5194. The Act lowered Defendant's mandatory minimum sentence to 120 months under 21

---

[1] Defendant's detention began July 1, 2008. ECF No. 61 at 3.

U.S.C. § 841(b)(1)(B) from the 240 months under 21 U.S.C. § 841(b)(1)(A) applicable at sentencing. *Compare* ECF No. 61 ¶ 120, *with* ECF No. 91. The Act also allowed certain federal inmates, including Defendant, to seek resentencing under modern law. *See* ECF No. 91. In a 2019 pro se filing, Defendant argued several factors warranted such a reduction. ECF No. 87. These included his spotless disciplinary record in prison, concern for his children's well-being in a single-parent household, and his extensive use of rehabilitative programming. *Id.* at 1–5. Once released, Defendant said he planned to obtain his commercial driver's license. *Id.* at 3.

"I am a different man than I was then," Defendant wrote. *Id.* "I won't say I'm wise, but I'm smarter and more determined to be a better man, father[,] and citizen to my family and community as a whole." *Id.* at 3–4. On March 25, 2019, the Court reduced Defendant's term of imprisonment to 184 months, giving him a July 25, 2021, release date.[2] ECF No. 91. The Court also reduced his subsequent term of supervised release to eight years. *Id.*

Of course, 2019 was a very different year from 2020. The virus known as COVID-19 has killed more than 116,000 Americans and infected more than 2.1 million in a few months. *Mortality Analysis*, Johns Hopkins U. & Med. (June 16, 2020, 3:00 AM), https://coronavirus.jhu.edu/data/mortality. "At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others." *S. Bay United Pentecostal Church v. Newsom*, No. 19A1044, 2020 WL 2813056, at *1 (U.S. May 29, 2020) (Roberts, C.J., concurring).

We limited access to courts, schools, churches, theaters, and "non-essential" businesses—places where there are too many people and too little space to keep the virus from spreading. That also sounds a lot like federal prison. Already "tinderboxes for infectious disease," prisons

---

[2] The FPD asserts, and the Government does not dispute, that Defendant likely would be placed in a halfway house by the end of this year. ECF No. 95 at 1.

now are even more dangerous than we typically accept. *United States v. Rodriguez*, No. 2:03-CR-00271-AB-1, 2020 WL 1627331, at *1 (E.D. Pa. Apr. 1, 2020). At least 1209 inmates and 168 Federal Bureau of Prisons (BOP) employees have "open" and "confirmed" cases. *COVID-19 Cases*, Fed. Bureau Prisons (June 16, 2020), https://www.bop.gov/coronavirus/. Eighty-five inmates and an employee have died. *Id.* Meanwhile, 4940 inmates and 502 staff have had the virus but recovered. *Id.* There are no open and confirmed cases at Defendant's prison, USP Leavenworth.[3] *Id.*

It is hard to compare these numbers to those for the United States at large. This is so because it remains unclear when the BOP tests inmates or employees. *See BOP Implementing Modified Operations*, Fed. Bureau Prisons, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited June 16, 2020) (describing inmate screening procedures). The BOP screens staff through "self-reporting and temperature checks." *Id.*

The BOP indeed faces a daunting task. It has undertaken emergency measures to halt the virus's spread. *Id.* Social visits are cancelled, prisoner movement is limited, and legal visits are suspended subject to exception. *Id.* At the same turn, it is unclear what the future holds as states relax restrictions on free residents, including BOP employees. Indeed, some states already are seeing a resurgence in cases, suggesting the United States has time yet with COVID-19. Jennifer Calfas, *New Cases Grow in Over Dozen States*, Wall St. J., June 16, 2020, A6.

On April 2, 2020, Defendant requested compassionate release from his warden pursuant to 18 U.S.C. § 3582(c)(1)(A), another First Step Act provision. ECF No. 95-4 at 3. He argued

---

[3] When Defendant filed his Motion, a single staff member at USP Leavenworth had contracted and recovered from COVID-19. ECF No. 95-1 at 11. Since then, four more staff members have contracted the virus and recovered. *COVID-19 Cases*, Fed. Bureau Prisons (June 16, 2020), https://www.bop.gov/coronavirus/. Meanwhile, it appears there was a small outbreak at a nearby halfway house, where one inmate currently has COVID-19 and forty-seven have recovered. *Id.* In short, the Court cannot find that the situation in Leavenworth, Kansas, is stable.

his high blood pressure and respiratory problems, among other issues, created a risk of COVID-19 complications. *Id.* at 2–3. He also cited the amount of time he has served, his spotless disciplinary record in prison, and his general rehabilitation. *Id.* at 3. A doctor who viewed Defendant's medical records concluded "it is clear that he would be at risk of both a more severe case as well as a higher likelihood of adverse outcomes if he were to contract COVID-19." ECF No. 95-3 at 2.

## II. ANALYSIS

The First Step Act of 2018 amended numerous provisions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration. Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019). Congress designed the statute at issue here, § 3582(c)(1)(A), for "Increasing the Use and Transparency of Compassionate Release." § 603(b), 132 Stat. at 5239. This provision allows defendants, for the first time, to petition district courts directly for compassionate release. *Id.* Under the old regime, defendants could petition only the BOP Director, who could then make a motion, at his or her discretion, to the district court. *See* U.S. Sentencing Guidelines Manual § 1B1.13 cmt. n.4 (U.S. Sentencing Comm'n 2018) [hereinafter U.S.S.G.]. The Director rarely did so. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

### A. *Exhaustion*

The First Step Act's gate-keeping provision created two ways for a defendant to bring a compassionate release motion to a district court. The defendant may file a motion after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the

defendant's behalf *or* the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." § 3582(c)(1)(A).

Here, the Government agrees Defendant satisfied the gate-keeping provision because thirty days have passed since the BOP received his request. ECF No. 96 at 1 n.1. The Court may thus address the merits.

B. *Extraordinary and Compelling Reasons*

Compassionate release provides a path for defendants with "extraordinary and compelling reasons" to leave prison early. § 3582(c)(1)(A)(i). Such a sentence reduction must comply with the 18 U.S.C. § 3553(a) factors and "applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A).

1. Definitions

Congress never defined what constitutes "extraordinary and compelling." *See* 28 U.S.C. § 994(t). Instead, Congress directed the Sentencing Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples. *Id.* Before the First Step Act, the Commission provided just three: terminal illness, an elderly inmate's rapidly declining health, and care for dependent family members. U.S.S.G. § 1B1.13 cmt. n.1. Defendant does not claim any of these examples apply here.

The Commission also provided a catch-all provision that allows the BOP Director to determine "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the" examples described above. *Id.* § 1B1.13 cmt. n.1(D). That still begs the question: what is extraordinary and compelling?

Congress and the Commission gave two general guideposts. Extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing." *Id.* § 1B1.13

5

cmt. n.2.  For example, just because a judge believes a defendant will dramatically improve himself while incarcerated, that does not mean she cannot deem such improvement extraordinary and compelling.  And although "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason," its mention by Congress indicates rehabilitation may be considered with other factors.  § 994(t) (emphasis added); *see also* U.S.S.G. § 1B1.13 cmt. n.3.

Courts otherwise are left to themselves because the Commission never updated its policy statement for the First Step Act.[4]  Rather, the outdated policy statement still assumes compassionate release "may be granted only upon motion by the Director of the Bureau of Prisons."  U.S.S.G. § 1B1.13 cmt. n.4.  This left district courts in a conundrum.  On the one hand, Congress unequivocally said it wished to "[i]ncreas[e] the [u]se . . . of [c]ompassionate [r]elease" by allowing district courts to grant petitions "consistent with *applicable* policy statements" from the Commission.  § 3582(c)(1)(A) (emphasis added).  On the other hand, the Commission has not made the policy statement for the old regime applicable to the new one.

Many courts, including this one, have concluded this means the Commission lacks an applicable policy statement regarding when a court can grant compassionate release.  *United States v. Brown*, No. 4:05-CR-00227-1, 2020 WL 2091802, at *6 (S.D. Iowa Apr. 29, 2020), *appeal dismissed following government request*, No. 20-2053 (8th Cir. June 16, 2020); *United States v. Haynes*, No. 93 CR 1043 (RJD), 2020 WL 1941478, at *14 (E.D.N.Y. Apr. 22, 2020) (citing thirteen such cases).  In the absence of an applicable policy statement, these courts conclude "the Court can determine whether any extraordinary and compelling reasons other than

---

[4] The Commission cannot amend its guidelines until it again has four voting commissioners. *United States v. Cantu*, No. 1:05-CR-458-1, 2019 WL 2498923, at *1 n.1 (S.D. Tex. June 17, 2019) (quoting *United States v. Handerhan*, No. 1:10-CR-00298, 2019 WL 1437903, at *1 n.4 (M.D. Pa. Apr. 1, 2019)).  The Commission still has only two voting members. *About the Commissioners*, U.S. Sentencing Comm'n, https://www.ussc.gov/commissioners (last visited June 16, 2020).

those delineated in U.S.S.G. § 1B1.13 cmt. n.1(A)–(C) warrant granting relief." *Cantu*, 2019 WL 2498923, at *5; *see also United States v. Fox*, No. 2:14-CR-03-DBH, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) (treating "the previous BOP discretion to identify other extraordinary and compelling reasons as assigned now to the courts"). The result is that the district court can consider anything—or at least anything the BOP could have considered—when assessing a defendant's motion. This now "appears to be the majority position." *United States v. Scott*, No. 17-CR-156, 2020 WL 2508894, at *8 (E.D. Wis. May 15, 2020). It also is safe to say Congress is aware of courts' use of the law during the pandemic. *See* Cong. Research Serv., R46297, *Federal Prisoners and COVID-19: Background and Authorities to Grant Release* 9 (2020).

To be sure, some courts and the Government still maintain that the First Step Act merely allows courts to grant a motion for compassionate release if the BOP Director would have done the same under the Sentencing Guidelines and the BOP Program Statement written for the old law. These courts conclude they may not stray beyond the specific instances listed in § 1B1.13's commentary. *E.g.*, *United States v. Lynn*, No. CR 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019). They reason that the Sentencing Commission reserved that commentary's residual provision for the BOP Director and only the BOP director. *Id.*

The Court remains unpersuaded. The U.S. Supreme Court repeatedly has noted that "'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528–29 (1947)). Although titles are not dispositive, sometimes they can be "especially valuable." *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring).

Such is the case here.  The Act listed these changes under the title of "Increasing the Use and Transparency of Compassionate Release."  § 603(b), 132 Stat. at 5239.  Congress knew of the BOP's rare granting of compassionate release petitions.[5]  Until 2013, on average, "only [twenty-four] inmates were released each year."  *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).  That number increased to eighty-three inmates between August 2013 and September 2014 following complaints to the BOP from the Inspector General's office.  *Id.*  Since Congress still amended the program following this increase, one can infer Congress thought eighty-three was still insufficient.  Because rather than "effectively ratif[ying]" the BOP's position, Congress sought to overturn it by statute.  *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000).  Therefore, the only way inmate motions to courts would increase the use of compassionate release is to allow those courts to consider the vast variety of reasons that may be "extraordinary and compelling."

Yes, releasing defendants from incarceration is a delicate business—but not any more so than incarcerating them initially.  Indeed, Congress and the Supreme Court have long trusted district courts to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Koon v. United States*, 518 U.S. 81, 113 (1996).  In sum, if the First Step Act is to increase the use of compassionate release, the most natural reading of § 3582(c) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it.

---

[5] The First Step Act's compassionate release provisions originally appeared as a stand-alone bill.  Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018).  That bill explicitly sought to "improve the compassionate release process of the Bureau of Prisons."  *Id.*

2. Defendant's Extraordinary and Compelling Reasons

Without a clearly prescribed definition, Defendant argues the Court should turn to persuasive authorities from courts and commentators as to what constitutes extraordinary and compelling. For instance, Defendant notes that Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." *Extraordinary*, Black's Law Dictionary (11th ed. 2019). The oft-cited book meanwhile defines "compelling need" as "[a] need so great that irreparable harm or injustice would result if it is not met." *Compelling Need*, Black's Law Dictionary (11th ed. 2019). Although the Court does not believe these words constitute the beginning and end of the analysis, they are worth keeping in mind.

a. COVID-19

The number of courts agreeing the COVID-19 pandemic constitutes an extraordinary and compelling reason for release still grows by the day. *E.g.*, *United States v. Williams*, No. 06-CR-0143 (WMW/FLN), 2020 WL 3097615, at *2 (D. Minn. June 11, 2020); *United States v. Nazzal*, No. 10-20392, 2020 WL 3077948, at *4 (E.D. Mich. June 10, 2020); *United States v. Mason*, No. 317CR104CWRLRA3, 2020 WL 3065303, at *2 (S.D. Miss. June 9, 2020); *United States v. Conner*, No. CR07-4095-LTS, 2020 WL 3053368, at *7 (N.D. Iowa June 8, 2020); *United States v. Moore*, No. 3:16-CR-00171-JO, 2020 WL 2572529 (D. Ore. May 21, 2020); *United States v. Galloway*, No. RDB-10-0775, 2020 WL 2571172 (E.D. Mich. May 21, 2020); *United States v. Parker*, No. 2:98-cr-00749, 2020 WL 2572525 (C.D. Cal. May 21, 2020*)*; *United States v. Schneider*, No. 14-CR-30036, 2020 WL 2556354, at *1 (C.D. Ill. May 20, 2020); *United States v. Hill*, No. 3:19-cr-00038 (JAM), 2020 WL 2542725 (D. Conn. May 19, 2020); *United States v. Bright*, No. 2:15CR00015-005, 2020 WL 2537508 (W.D. Va. May 19, 2020); *United States v. Bischoff*, No. 17-cr-196-JD, 2020 WL 2561423 (D.N.H. May 18, 2020); *United States v.*

*Cotinola*, No. 13-CR-03890-MV, 2020 WL 2526717, at *3 (D.N.M. May 18, 2020); *United States v. Rountree*, No. 1:12-CR-0308 (LEK), 2020 WL 2610923 (N.D.N.Y. May 18, 2020); *United States v. Johnson*, No. 15-cr-125 (KBJ), 2020 WL 2515856 (D.D.C. May 16, 2020); *United States v. Bess*, No. 16-CR-156, 2020 WL 1940809, at *9 (W.D.N.Y. Apr. 22, 2020); *United States v. Smith*, No. 12 CR. 133 (JFK), 2020 WL 1849748, at *4 (S.D.N.Y. Apr. 13, 2020); *United States v. Hernandez*, No. 18 CR. 834-04 (PAE), 2020 WL 1684062, at *3 (S.D.N.Y. Apr. 2, 2020); *Rodriguez*, 2020 WL 1627331, at *1; *United States v. Jepsen*, No. 3:19-CV-00073(VLB), 2020 WL 1640232, at *5 (D. Conn. Apr. 1, 2020); *United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL 1489829, at *1 (S.D.N.Y. Mar. 27, 2020).

Numerous courts also have held release particularly is justified when the inmate suffers from preexisting health conditions that increase the likelihood of a lethal COVID-19 case. High blood pressure and moderate-to-severe asthma are two such conditions. *United States v. Anderson*, No. 15-CR-30015, 2020 WL 2521513, at *5 (C.D. Ill. May 18, 2020) ("Defendant suffers from hypertension, a condition that increases the serious risks that COVID-19 presents for Defendant."); *United States v. Gorai*, No. 218CR220JCMCWH, 2020 WL 1975372, at *3 (D. Nev. Apr. 24, 2020) ("The court finds that defendant's asthma falls squarely within the ambit of preexisting conditions that the [Centers for Disease Control and Prevention (CDC) have] unambiguously explained place him at greater risk of COVID-19."); *see also United States v. Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *3 (S.D.N.Y. Apr. 24, 2020) (noting that, according to the CDC, "people with ailments that cause trouble breathing, particularly asthma, . . . are at a significantly higher risk"); *United States v. Colvin*, No. 3:19CR179 (JBA), 2020 WL 1613943, at *3 (D. Conn. Apr. 2, 2020); *Rodriguez*, 2020 WL 1627331, at *7.

No one disputes Defendant has high blood pressure and asthma. ECF No. 96 at 3. The Government and Defendant only dispute these conditions' significance. Defendant acknowledges there are outstanding questions as to asthma's implications for COVID-19 patients. ECF No. 95-1 at 13. Yet moderate-to-severe asthma remains listed as a risk factor on the CDC's website.[6] *Groups at Higher Risk for Severe Illness*, Ctrs. for Disease Control & Prevention (May 14, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. The Government meanwhile argues that hypertension—or high blood pressure—does not constitute a COVID-19 risk factor. ECF No. 96 at 4. That unqualified assertion is belied by Defendant's medical evidence and the CDC. ECF No. 95-1 at 12; ECF No. 95-3 at 1; Ctrs. for Disease Control & Prevention, *supra*.

The Government is right that the BOP knows how to treat high blood pressure. *Id.* at 4. This misses the point. A doctor who reviewed records supporting Defendant's history of hypertension concluded "it is clear that he would be at risk of both a more severe case as well as a higher likelihood of adverse outcomes if he were to contract COVID-19." ECF No. 95-3 at 2. The Court's concern, thus, is that Defendant's preexisting medical conditions create an untenable risk of death should Defendant contract a lethal, easily spread virus for which "there is no known cure, no effective treatment, and no vaccine." *S. Bay United Pentecostal Church*, 2020 WL 2813056, at *1 (Roberts, C.J., concurring). It also is telling that three months since COVID-19 has reshaped America, the Government is yet to provide expert medical evidence, at least to this Court, showing that such health conditions do not increase the risk of COVID-19 complications. Barring such evidence, the Court is loath to disregard Defendant's.

---

[6] The presentence investigation report indicated Defendant "has asthma, though it is reportedly not severe." ECF No. 61 ¶ 102.

The case for release becomes more compelling, still, for a defendant with a very small fraction of his sentence left. *United States v. Perez*, No. 17 CR. 513-3 (AT), 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020). This is so because "[t]he benefits of keeping him in prison for the remainder of his sentence are minimal, and the potential consequences of doing so are extraordinarily grave." *Id.* Defendant has been in custody since July 1, 2008, has a projected release date of July 25, 2021, and is likely to be in a halfway house by the end of this year. ECF No. 61 at 3; ECF No. 95 at 1. That is about ninety-two percent of his sentence, including good time credits. As in *Anderson* from the neighboring Central District of Illinois, the fact "Defendant has approximately one year remaining on his sentence and had committed no infractions while in BOP custody" further supports release. 2020 WL 2521513, at *5.

Although USP Leavenworth does not have a confirmed, open case, that fact does not provide much assurance in the current environment. *See Moore*, 2020 WL 2572529, at *2 ("Some BOP facilities have seen [outbreaks] grow into hundreds of confirmed cases in a matter of weeks."). Several USP Leavenworth staff members have contracted the virus, and the virus has spread at a nearby halfway house. *COVID-19 Cases*, Fed. Bureau Prisons (June 16, 2020), https://www.bop.gov/coronavirus/. It also is undeniable that an imprisoned American is more likely to contract COVID-19 than a free one. ECF No. 95-1 at 10–11; *see also* Timothy Williams et al., *Infection Rates Escalate in Prisons, and Fear Among Inmates Does, Too*, N.Y. Times, June 17, 2020, A8.

Thus, Defendant presents an "extraordinary" reason because he has at least one specific condition that makes him particularly vulnerable to a lethal case of COVID-19. The Court also

finds this reason is "compelling" because it would indeed constitute an irreparable harm and injustice if Defendant contracted a deadly case of COVID-19 while he is so close to freedom.[7]

  b. Rehabilitation

Defendant also argues his substantial rehabilitation during twelve years in prison constitutes a second extraordinary and compelling reason. As discussed above, "[r]ehabilitation of the defendant *alone* shall not be considered" sufficiently extraordinary and compelling to justify compassionate release. § 994(t) (emphasis added).

A "statute should be construed so that effect is given to all its provisions." *Corley v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Thus, for the word "alone" to do any work—as it must—that means courts can consider rehabilitation as *part* of a compassionate release motion. Several courts, including this one, have concluded the same and considered a defendant's rehabilitation in granting compassionate release. *E.g.*, *Brown*, 2020 WL 2091802, at *7.; *United States v. Wade*, No. 2:99-CR-00257-CAS-3, 2020 WL 1864906, at *5 (C.D. Cal. Apr. 13, 2020); *United States v. Chan*, No. 96-CR-00094-JSW-13, 2020 WL 1527895, at *6 (N.D. Cal. Mar. 31, 2020); *United States v. Perez*, No. 88-10094-1-JTM, 2020 WL 1180719, at *3 (D. Kan. Mar. 11, 2020).

Here, Defendant provided ample evidence that he is no longer the same person who this Court incarcerated more than a decade ago. After every disadvantage he has faced and every bad choice he has made, Defendant has behaved flawlessly during his past twelve years in prison. ECF No. 95-2 at 14. He meanwhile appears to have done the hard work of trying to better

---

[7] The Court does not hold that every federal inmate can now seek compassionate release simply because of the COVID-19 pandemic. *E.g.*, *United States v. Pittman*, No. 4:18-CR-00043, 2020 WL 3026346, at *5 (S.D. Iowa June 5, 2020); *United States v. Starr*, No. 4:06-CR-00080, 2020 WL 2312045, at *3 (S.D. Iowa May 8, 2020).

himself through classes on specific job skills, substance abuse, anger management, victim impact, and parenting. *See id.* at 4, 5, 13.

The Court realizes convictions litter Defendant's teens and twenties. But, rightly or wrongly, this country's criminal justice system is premised on the idea that a person can—and hopefully will—change after several years locked in prison. The BOP tries to facilitate this through classes, case managers, reentry programs, and good conduct time credits. Defendant appears to offer an unalloyed success story.

In nearly twenty-three years on the federal bench, the Court has learned to avoid generalizations about criminal defendants. Even so, it is rare for an individual to spend twelve years flawlessly adhering to the rules of his sentence—inside or outside of prison. Such a long stretch of compliance usually signifies a defendant has turned the corner toward a law-abiding life. Based on Defendant's conduct and filings, the Court trusts that has occurred here. Thus, Defendant's substantial rehabilitation cuts in favor of release, even if it is insufficient to justify release on its own, under § 994(t). Considering this rehabilitation with Defendant's specific vulnerability to COVID-19 complications and the little time left on his sentence, the Court finds he provides extraordinary and compelling reasons for release.

### C.  *§ 3553(a) Factors*

Finally, the Court must consider if compassionate release comports with any applicable § 3553(a) factors. § 3582(c)(1)(A). The Court's lodestar is to ensure the sentence is "sufficient, but not greater than necessary." § 3553(a). In Defendant's case, the "nature and circumstances of the offense"—distributing crack cocaine—are serious. § 3553(a)(1). Of course, the Court must also recognize the U.S. Code has long mandated longer sentences for distributors of crack cocaine than those of powder cocaine. *Kimbrough v. United States*, 552 U.S. 85, 98 (2007). The

14

resulting racial disparity in sentence lengths is well-documented. *Id.* Defendant no doubt benefitted from Congress's recent attempts to correct that unfairness. *See* ECF No. 91. Yet that disparity, if softened, persists. U.S. Sentencing Comm'n, *Report to the Congress: Fair Sentencing Act of 2010*, 23 (2015).

With respect to "characteristics of the defendant," § 3553(a)(1), the Court must assess Defendant as a whole person. *Koon*, 518 U.S. at 113. Clearly, this was not Defendant's first conviction. *See* ECF No. 61 ¶¶ 70–77. But Defendant now is forty-eight years old, making him about half as likely to be convicted of a crime as a defendant released in his twenties. U.S. Sentencing Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 23 (2017). The Court also must consider Defendant's criminal history in the context of his deeply troubled upbringing. *See* ECF No. 61 ¶¶ 89, 91. And as discussed above, Defendant's behavior during the past twelve years has been impeccable. This suggests the characteristics of the Defendant today are not as they were at sentencing.

The "need for the sentence imposed" also appears weaker after nearly a decade of incarceration. § 3553(a)(2). Defendant has served two years more than what Congress determined to be the minimum punishment for his conduct. *See* § 841(b)(1)(B). Given the nature of Defendant's convictions and non-violent behavior in prison, incarceration is not necessary "to protect the public from further crimes of the defendant." § 3553(a)(2)(C). The BOP appears to agree. Defendant entered the BOP with a "medium" security classification, was reduced to "low," and most recently to "minimum." ECF No. 95-2 at 6. It also states he has a low risk of recidivism. *Id.*

Meanwhile, Defendant's use of prison programming and employment suggests an actual vocation—outside of prison—would best "provide the defendant with needed educational or

15

vocational training." § 3553(a)(2)(D). In a previous filing to the Court, Defendant stated he had spent more than a hundred hours training to obtain a commercial driver's license, something he plans to pursue upon release. ECF No. 87 at 2–3; *see also* ECF No. 95-2 at 5.

Nor is incarceration the only "kind[] of sentence available." § 3553(a)(3). Noncustodial sentences also curtail "prized liberty interests" and "the Defendant always *faces the harsh consequences that await if he violates the conditions*" attached to such a sentence. *United States v. Gall*, 374 F. Supp. 2d 758, 763 (S.D. Iowa 2005) (emphasis added), *rev'd*, 446 F.3d 884 (8th Cir. 2006), *rev'd*, 552 U.S. 38 (2007). Such restrictions also promote respect for the law, protect the public, and do not constitute any endorsement of Defendant's conduct. *See id.*

Although it is true the Sentencing Commission's Guidelines counseled in favor of a longer sentence, ECF No. 91, they are advisory and but one factor, *see* § 3553(a)(4). Furthermore, the fact Defendant has satisfied the ten-year mandatory minimum sentence for his offense means his release will not create a drastic sentencing disparity with defendants "who have been found guilty of similar conduct." § 3553(a)(6). The Court would have been well within its discretion to resentence Defendant to ten years. Had it known the twilight of Defendant's sentence would involve incarceration during a global pandemic that is particularly dangerous in prisons for those with Defendant's medical history, it would have done so.

A court's decision does not cease to be an "exercise of reason simply because it is also an exercise of compassion." *United States v. Likens*, 464 F.3d 823, 827 (8th Cir. 2006) (Bright, J., dissenting), *cited with approval in Gall*, 552 U.S. at 52 n.7. The Court grants Defendant's Motion for compassionate release because it is supported by extraordinary and compelling reasons as well as the § 3553(a) factors.

D. *Release Plan*

Defendant's remaining term of imprisonment shall be served as a term of supervised release. When that term expires on his current release date,[8] he shall then serve the eight-year term of supervised release already imposed. *See* ECF No. 91. Both terms of supervised release are subject to the conditions listed in the 2010 Judgment. ECF No. 78 at 3–4.

The Court must emphasize the last special condition of supervised release—to maintain legitimate employment. The U.S. Probation and Pretrial Services Office (USPO) shall assist Defendant in his efforts to secure employment, and Defendant shall accept and comply with such assistance. Defendant also shall reside at the home of his mother, Zella Williams, at 3201 30th Street, Building M, Apartment 9, in Des Moines, Iowa, until he obtains housing of which the USPO approves.

Upon release, Defendant shall contact the Southern District of Iowa USPO within seventy-two hours. He shall submit to USPO screening for COVID-19 following his release to the extent it is available. He also shall remain in self-quarantine for fourteen days upon returning home. He shall comply with national, state, and local orders regarding COVID-19.

III. CONCLUSION

For the reasons stated herein, Defendant's Motion for Compassionate Release (ECF No. 95) is GRANTED.

IT IS SO ORDERED.

Dated this 17th day of June 2020.

*Robert W. Pratt*
ROBERT W. PRATT, Judge
U.S. DISTRICT COURT

---

[8] Defendant is scheduled to be released July 25, 2021. ECF No. 95 at 1.